Number 25-1463. Welcome back, Mr. Fleming. Thank you. Again, Judge Hughes, may it please the Court, Mark Fleming from WilmerHale. Let's give him a minute to settle. Very well. Tell me when you're ready. Well, we have that minute. I trust you're not going to go over inventorship, but I'm not going to prevent him from making his argument. Of course not. So you can report back.                  But I think the arguments are fairly similar. There are a couple of points, if I may, where I think it's illustrative to show the Board fell even further into error in this case that are different. So if I may, I'd like to touch on those. But I don't plan on retreading old ground, unless the Court has questions, obviously. I suspect, I hope, my plan is to reserve more time for rebuttal, and I may not even use that if needed. Okay. I think he's sufficiently settled. So, Mr. Fleming. Thank you very much, Your Honor. May it please the Court, Mark Fleming from WilmerHale, with Jennifer Graber and Gary Fox, again, on behalf of Merck Sorono. As I said, I won't retread things that we've talked about in the prior case, but I think the Board fell even further into error here in at least three particular ways. Let me just make one housekeeping question. Of course. Answered by you before you go into the alleged errors you're going to identify. Okay. So it's the same patents, right? Yes. All of the claims that were in the prior appeal are here, right, plus additional claims. Correct. And then at least one overlapping reference, right, just to kind of set the stage. Yes. The asserted Bodor reference, which we don't think is prior art, different secondary reference. Rice instead of Stelmassiak. That's absolutely correct. I'd say three things, if I may, on the point that the dosing regimen in Bodor is not by another and therefore not prior art. Here the Board's violation of the rule of reason went even further, because it demanded that we provide not only evidence of specific contributions by Dr. DeLuca, but by each Serrano inventor. And that was quite remarkable, because the Board actually found that three of the inventors, Drs. Munafo, Lopez-Bresnahan, and ETA, are identified in the Amsterdam minutes as participants from the Serrano team, and that Dr. Munafo and Dr. Lopez-Bresnahan are copied on the regulatory briefing document from December 2003. And it called those two documents the most probative evidence for regimens discussed by the Serrano inventors. So this is a very extreme version of requiring us to point to a specific type of evidence, which is legal error under the rule of reason. Second, the Board faulted us, and this is another legal error, for not disproving a speculation by TWI that there were some unnamed Serrano scientists out there that also contributed to the disclosure in Bodor. That's an improper shifting of the burden. If TWI thought that other people contributed to the Bodor disclosure, other than the Serrano inventors, it was TWI's burden to prove that. It certainly was not our burden to come forward on a burden of production to refute a claim that they had provided no evidence for. And then third, the Board downplayed the sworn statements of Dr. Bodor and Dr. Dandeker, because they couldn't remember the source of their information that the Serrano scientists invented for the dosing regimen. Again, that's an error for a burden of production. We're not supposed to be evaluating credibility. We're supposed to be taking the evidence as true and deciding whether if taken as true it corroborates Dr. Manafo's overall account. Not remembering the source is not a basis for discounting their testimony at this stage. With regard to the separate Duncan parking issue, I'll note TWI, like Hopewell, doesn't offer any evidence at all that Drs. Bodor or Dandeker conceived of a 10 milligram dose. And it's important to distinguish here between the dose, which is 10 milligrams of cladribine, and the dosage form, which is the tablet that the IVAC scientists, Drs. Bodor and Dandeker, were charged with making by the Serrano team. And the dosage form is not claimed in this case, in these claims. It just has to be an oral formulation. It could be a liquid, it could be a 3 milligram tablet, it could be a 5 milligram tablet. You could do it lots of different ways. So the fact that they came up with that, and the fact that they made those tablets, does not satisfy the Duncan parking test. The most that TWI is going to be able to say is that the record is silent on who came up with a 10 milligram dose. We don't think the record is silent. We think we've put in plenty of evidence, certainly enough for a burden of production. But even if you give them their argument that the record is silent on who came up with it, that means they fail in their burden of persuasion. With respect to non-obviousness, Judge Cunningham, you're absolutely right. We're talking about a different secondary reference. But there's some findings with respect to Bodor that the board made here that I think are pretty important. In rejecting the anticipation argument that TWI makes, this is an argument unique to them. Hopewell didn't argue anticipation. The board rejected it. And the board said, Bodor does not disclose retreatment and any subsequent maintenance period and dosing amount is at best speculative based on Bodor's disclosure. That's page 36 of the appendix. And the board literally said, and this is highly unusual, this is page 50, that TWI's obviousness theory was that a skilled artisan would choose dose and interval through, quote, trial and error. And TWI's expert, Dr. Greenberg, likewise admitted, and this is 2089 and 90, paragraph 117 of his declaration, a maintenance phase could either be an increase, a reduction, or a continuation of the particular treatment dose of the induction phase. And then he says that Bodor simply instructs practitioners to apply whatever regimen would be deemed appropriate. That is throwing darts. In fact, it's almost literally throwing darts. Particularly when you consider- Can you repeat that page number that you gave me? Of course. In fact, I'll read it to you verbatim. It's 2089 of the appendix in the TWI case. You look at paragraph 117. And if you go to the sentence that begins six lines down, if you're with me, I'll make sure that I've got the right language for you. It's the sentence that begins, Bodor is silent on exactly what parameters would apply to the dosing regimen of the maintenance phase, and instead instructs practitioners to apply whatever regimen would be deemed appropriate. And then if you skip down to the bottom of that page, Bodor discloses a maintenance phase that, and then going to the top of 2090, could either be an increase, reduction, or continuation of the particular treatment dose of the induction phase, bold italic, as decided by a treating physician in concomitance with continuous evaluation. This is honestly not guidance at all. This is saying, you know, they would have figured it out somehow. How? Why? Looking at what criteria? And TWI, by the way, didn't even make the lymphocyte level argument that you heard from Mr. Rosenberg. They didn't make that argument at all in this case. Now the board violated the APA by coming up with it on its own, sua sponte, without giving us a chance to respond to it, but they have no evidence that a skilled artisan would optimize based on anything. This is literally saying it would be whatever is deemed appropriate, and this court has never said that that's enough to show obviousness. The Rice reference, the secondary reference for its part, actually teaches away from the claimed invention because it says you have to wait at least 12 months after the induction period, from the last dose in the induction period, before you start retreating again for safety reasons. And it's silent as to what you'd actually retreat with, at what dose, at what frequency. Dr. Greenberg admitted this. The board didn't address this evidence at all, even though it detracted from its conclusion and so it was required to address it under the APA. So this isn't a battle of the experts. I mean, the evidence, I think, I don't think can fairly be disputed. Rice didn't show clinical efficacy, said that. Rice taught away from retreating before 12 months. Our claims are do it after 8 to 10 months. Rice taught away from that. And Dr. Greenberg admitted that Rice doesn't disclose a retreatment dose at all. The board didn't explain why it rejected that evidence. We also have, in this case, an argument about unexpected results. We have it in the other case too, but we didn't brief it in this court, but we have it here. The Clarity Extension Study and later follow-on studies showed that after the first two years of treatment, patients have long-lasting benefits up to a mean of over 10 years. The board recognized this was unexpected on page 63. The board nonetheless discounted this because it thought we should have compared the results to Bodor, which is a stark legal error under Millennium because Bodor doesn't have any results. Bodor, again, was not claiming a regime for treatment. It was just claiming the tablets. So it didn't have a clinical trial. It wasn't able to say what the results of its tablet or the disclosed regimen actually were. Our expert compared the results to the studies that actually have results, like Rice and Romine, and the board found that Rice didn't report results that were favorable to the same extent. It's on page 62. So properly considering the unexpected results here would have made a significant difference, not least because it refutes the board's view that a skilled artisan could just have routinely optimized their way to the claimed invention. If that were the case, these results would not have been unexpected. The claim construction arguments are just the same. The plain language of the claims requires dosing based on patient weight. The board recognized that in this very case by initially denying institution. The board changed its mind but cited no basis in the intrinsic record for doing so, and in fact, it didn't even mention its prior reasoning. We think the correct way to construe the claims is requiring that the dose be selected in milligrams per kilogram based on patient weight, and the case should be remanded under that claim construction. But again, unless the court has further questions, we think the right way to decide this is the easiest way. And I think the best way for the development of the law, frankly, is to clear up the way to deal with by another, and we think the NPEP got it right based on this Court's  And under that view, Bodor is not prior art, and that's the end of both of them. If there are no further questions at this time, I hope not to need five minutes for rebuttal, but I'll reserve it with the Court's permission. Thank you, counsel. Thank you, Ron. Mr. Segrist. Yes, Your Honor. May it please the Court. Philip Segrist for the Appellee TWI. I'd like to start by giving a little bit of the history on this. I want to make sure we don't lose the forest for the trees and the details of who did what, and then talk about applied materials, because I think there's some more detail that needs to be discussed there. And then talk about the evidence that was submitted. Any questions you have, please interrupt me, and I'll try to get directly to them. Cladrabine was originally being developed not by IVACS, which is where Bodor and Dandeker are from, not by Serrano, which is where the named inventors are from. It's being developed by Scripps. And then Scripps assigned that to IVACS, not to Serrano, to IVACS. And IVACS brought in Serrano as a licensee. This is all from the materials that they submitted. So this is not a case where IVACS is just there to manufacture a 10-milligram tablet. IVACS was developing the oral dosing formulation, and I'll get into more detail. That's reflected in the documents they submitted for corroboration. And that's the whole point of this patent, was the oral dosing formulation on this regimen. The schedule was not new. You already had prior art that disclosed, do it five to seven days a month, and then wait, and five to seven days for a month, wait, the next month do it five to seven days. That's in the prior art, but it wasn't there for an oral formulation. It was there for intravenous injection. So these two companies were working together, but they didn't pursue a joint patent. They kept it separate, which is fine. They can do that. They don't get the benefits of things like Section 103 provision, that you've got a common assignee on the patents. The references aren't available as prior art under 103, but they didn't do that. They said, we're each going to go our own way. Now, Bodor was then cited against these patents during the prosecution. And the examiner said there, and this is why it was allowed over Bodor, that what Bodor does not disclose is that the maintenance period is less than the induction period. That's the distinction the examiner drew. This is discussed in more detail in our brief, pages 11 through 16, but that particular language that the examiner pointed to is appendix pages 1391 through 92 and appendix page 1928. The reason I'm focusing on that language is because that's not in the challenge claims. That's the limitation in the claims we did not challenge, that the maintenance period is less than the induction period. In the challenge claims, they're the same. So under the examiner's analysis, Bodor wasn't missing anything, because the examiner agreed with our position that the maintenance period was implied in Bodor. Now that was our anticipation challenge. We didn't cross appeal on anticipation, we think we're right on it, it's the same result. But I want to focus on the obviousness analysis. And I do want to talk about applied materials, because that language is confusing, where it talks about different inventive entities conceived. And it's confusing because when it's talking about inventive entities conceived, it's not talking about the disclosure. It's talking about the named inventors on those patents, because the named inventors match up with the claims. In applied materials, both of those patents came from the same original disclosure. You had continuations, divisions, continuations in part. And the tribunal below had held that the claims in the later patent were anticipated by the disclosure in the earlier patent, all of which claimed priority to the same disclosure. And that's what the federal circuit was talking about. The court below had said, well, you named different inventors on this earlier patent than you named on the later patent. And therefore, it's a different inventive entity. And the court said, no, that's not right. It doesn't matter who contributed to the claims in each patent. What matters is whether the inventive entity in the patent being challenged, that's who contributed to the disclosure in the earlier patent. And the court said that because you found anticipation, you're saying that every claim element was disclosed. And if every claim element was disclosed on something that's claiming priority to that same document, then it's not available as prior art. And that's all that that meant. It wasn't saying you only have to have some of the same people. Now, you can have a situation where the previous application, the disclosure is made by one of the later joint inventors. But it has to be a disclosure of the joint invention. And then, if it's a disclosure of the joint invention by only one of them, later when they file the app and they're not claiming that joint invention, a later application claiming the joint invention, then that may not be available. But only if the entity who developed the subject matter being disclosed is the same. It's got to be the same as the inventive entity later. That's a common theme of patent law. And it's in the land case. You can't decide land that way if it's sufficient for at least one of the joint inventors to have made the disclosure. And it's in the Katz case as well, which I think makes it even more clear, where Judge Rich was describing, that the joint entity is different. There's a different entity from each individual. And if the individual makes a disclosure of the joint invention, then that's a disclosure from the joint entity even that was written by one of them. But if you're talking about what one person did and what another person did, that's available as prior art because that's by another. It's not by the joint named inventors, which is what you have to have, which what their evidence didn't show. Let's talk about what their evidence did show. I explained before, you have a fairly conclusive statement from Monofoe. Where it really breaks down is in the documents they point to as corroboration. There is no lab notebooks. There are no development documents. We tried to get discovery on this. PTAP said you don't need discovery for an IPR. There's no invention disclosure statements. There's nothing showing a communication of this directly from Cerono to IVACS. What you have, three documents. One of them is a product development agreement. This is the agreement where IVACS licensed Cerono. And that agreement, IVACS is the licensor. They're the ones who are developing an oral formulation. This is on page appendix 5938. It's in recital F on the first page of that agreement. It says that IVACS is developing the oral formulation. Now, counsel pointed out that the claims for site, an oral formulation, and not necessarily just a 10 milligram. Well, IVACS was the one developing oral formulation. Not just 10 milligram or 3 milligram. Not necessarily, they did it in the form of tablets. But the product development agreement that they're pointing to as corroboration actually shows our case. It shows that the IVACS inventors were the ones who were developing the oral formulation. And so when Dr. Bodor and Dandeker testified that they didn't develop the regimen, that's because they weren't looking at the oral formulation as being part of the regimen. They were just looking at the schedule. That's what they thought it meant by regimen. And they didn't develop the schedule. In fact, really, Cerono didn't develop the schedule either. The schedule had been out there. It was in the other references incorporated by reference in Bodor. What was new was using the schedule for an oral dosing form. The next document is the briefing document. One other thing is that the licensees, Cerono, their obligation under the agreement was to run the clinical trials. That's why they developed a briefing document, for example. All the regulatory approvals were involved in that in Europe or in the United States or wherever they're gonna run them. So that's where they come up with the specific schedule because that's what has to go into the clinical trials. You have to spell that out to get approval for it. But that was their obligation, was clinical trials. That's on page 59, 55 of that same joint document. The next one they point to is this briefing document. That's the document to get approval to do the, it was just a draft of, it's not one that's submitted, to get approval to do the clinical trials. The briefing document is not invention disclosure. It's summarizing all the work that's gone on before. It talks about the work that Scripps did before. It talks about the different safety standards. Nothing in the briefing document indicates any contribution by the named inventors to the briefing document. Now, the named inventors are listed on the first page of the cover email that distributes that briefing document. Mr. Scripps, can I take you to a, this is, I'm not sure that this is something that's open for me to decide, but I've been thinking about the policy implications of this and so I understand why it makes sense that if you have two inventors on an earlier disclosure that if one person, one of those people then tries to file a patent on it, they shouldn't be able to do that. That earlier one is by another because it was invented by the two and not just the one. I don't understand the policy on going the other way, which is like this case where you have, let's just assume three of the four people on the patent were the inventors in the earlier disclosure. The fourth wasn't. What policy reason is there for saying those three people who are on this other disclosure don't get the benefit of the one-year rule just because another person is added in? It still encompasses all of the inventors of the earlier one plus instead of all of the inventors minus and it seems to me that there's different policy implications there. There may be some different policy implications, but that's the way the law. No, no, no, but that's what I want to know. I agree with you. I may not be able to do anything with this because if I read the case law the way you read the case law, I think you might be right, but why is our case law right? Well, and part of the policy may be because the statute used to be different, right? Your patent term wasn't from filing, it was from issue and you could stretch things out by adding other inventors and there were reasons for not doing that. And we've updated the statute since then with things like the amendment to 103 says you've got a common obligation of assignment. It's not available for prior art under 103. So there have been policy positions taken to address that concern and Congress has taken those, but there's really nothing for this court to do to change at least 60 years and probably a lot more law on having to have the same entity. So the issues we have here are, I mean, I'm sure they're gonna keep coming up in pre-AIA cases, but they're not gonna happen anymore in the first-to-file patents. I would think it would be less of an issue. I can't guarantee that you'll never see something like that come up under first-to-file, but I do think it would be less of an issue. And the policy reason is once the three have put it out there and not claimed it, that goes to the public domain and adding a fourth person in to collaborate doesn't take that out because it wasn't that inventive entity's prior work that's being disclosed. So that's when you get the benefit of the one year because it is the inventive entity that came along later, that did the subsequent patent or got the claims in the subsequent patent. I do want to go back to that briefing document and then the Amsterdam minutes because I disagree with one thing that Council was saying. He's saying we have no evidence about, or that we didn't argue that Dandeker and Bodor conceived. They did conceive oral formulation. That's what they claimed in their patent is the oral formulation, and we said that in our brief. I think they were cited page 27 of our response. What we actually said, we didn't say there's no evidence of it. We said they didn't come forward with evidence of who did what. We also said that Bodor and Dandeker did conceive of the oral formulation. I mentioned the briefing documents, nothing in that that ties it to particular inventors. Yogesh Dandeker is also listed on that cover email because he was participating and providing information to that as well. You look at the Amsterdam minutes, though this work is interesting. Dandeker's on that too. He was at that meeting, and it confirms that he discussed the formulation development and the patents that IVACS was filing. This is on page 6036 of the appendix. So they knew that the oral formulations were IVACS and that they were filing those patents. It confirms that Dandeker would make a 10 milligram tablet in addition to the three milligram tablet already proposed. Merck is arguing that make here just means they're simply the manufacturers of it. That's not what make means here. IVACS was the one developing oral formulations. Now by this point, they had developed the oral formulation that was being used in tablets. So it was really just a re-machining process at that point. But they're the ones who conceived of all of that, conceived of the oral formulation forms, and that's what these claims require. I see that I'm out of time. Thank you. We've heard a lot of argument in this case, and it's been helpful, but I guess you're out of time. Mr. Fleming, if you have specific things you want to respond to. There are only three things I'd like to say. Number one is to the extent, and I know your question didn't say this, but to the extent there's something in your mind thinking this is just going to go away once the pre-AIA period is over. This issue could come up through 2039. It's going to be around for a while. Mr. Rosendahl's colleagues at the Stern-Kessler firm wrote an article that we cite in the other case saying that pre-AIA law will govern patents with priority dates back to 2013. They're good for 20 years. It takes you to 2033, and then you have a six year look back for an infringement case. So you could go to 2039. So this is an issue that really would benefit from this court's guidance. There's been a lot of talk about applied materials, and Mr. Segrest made an argument that supposedly the earlier patent in that case fully disclosed the invention in the later patent. It's actually really interesting and really worth looking at those two patents. They're back from the time when patents were very short. They're only about five pages long, and you can see it's very clear that the second patent, which added Mr. Locke as a new inventor, comparable to the situation that's being argued here where supposedly Dr. DeLuca was added later. We don't agree with that, but let's assume that that's the case. The patent that includes Mr. Locke had a lot of discussion of, and actually claimed, crystal and wafers that have little or no crystallographic slip. None of that is in the earlier 712 patent. The 313 patent, which comes later, is remarkable. It adds two brand new figures. It has multiple paragraphs at the end of the patent, and all the language about wafers and crystals and lacking a crystallographic slip is new in the 313 patent. So there is no way that the court actually thought that the invention in the 313 patent was fully disclosed in the 712 patent. The sentence that Mr. Segrest talks about starts with the word if. It is a contingent statement. It's hypothetical, and the court got to the result the way it got to it. But it is not the case that Mr. Locke's invention regarding wafers and the lack of crystallographic slip was fully disclosed in the prior disclosure, and that's why we think that case significantly helps us. And even if we're wrong about that, I've touched a little bit on the NPEP, but let me just read the passages that we thought we could rely on as practitioners in front of the PTO. 2136.05b, a rejection can be overcome, quote, by showing that the disclosure is a description of the inventor's or at least one joint inventor's previous work. 7.1501c, a rejection may be removed by submission of evidence establishing, dot, dot, dot, that the knowledge of the relevant subject matter came from the inventor or at least one joint inventor. The same language appears in 716.10 and 2132.01. I know it's not binding precedent. We're not citing it that way, but we're showing that the PTO read the cases the way we read the cases, and that's what we have relied on and what patent examiners and the board in other cases have relied on as the correct articulation of the law, and one of the reasons for it, Your Honor, is the policy reason that Judge Hughes, you articulated in your question to counsel, which is what is the point of, it's not as though the inventors here are trying to take something away from Drs. Bodor or Dandeker that they rightly invented. It's not like the situation where, frankly, Dr. Katz was trying to take something, be a sole inventor of something that his grad students arguably contributed to and put in a declaration, or King and Schwartz and Duncan Parking. Here you just have the addition of someone who contributed, arguendo, something to the ultimate patent. There is no reason to interpret the law that way. The statute just says, by others. For Mr. Segrist to stand up here and say, oh, Congress just wrote an unfair statute. They didn't. It just says, by others. It's up to this court to interpret that language, and we think it's perfectly fair to interpret it the way the NPEP has interpreted it for years, or at the very least, to say, you know, we're gonna decide that Mr. Segrist is right, but there was no notice of this, and therefore, Merck should be given a chance to develop a record on remand to meet the rule that is contrary to everything that had been indicated in both this court's recent cases and in the NPEP. I know there's been a lot in these cases this morning. If the court has any further questions, I'd be happy to address them. Otherwise, I thank the court very much for its attention. Thank you. Thanks to both counsel. The case is submitted.